PAT LUM v. THE STATE.

1. PRACTICE — IMPEACHMENT OF WITNESS. — In a trial for murder it appeared that B.; a State's witness, at the time of the homicide lived in the locality where it was committed, but that he had been living in an adjoining county for two or three years before the trial. Assailing his general reputation for truth, the defense asked the impeaching witnesses if they knew what that reputation was when he lived where the homicide was committed. On objection by the State the trial court disallowed the question, and ruled that the inquiry should be restricted to the time of the trial. *Held*, that the question was a proper one, and the ruling erroneous. The presumption in favor of the continuance of an established *status* obtains with regard to a witness's reputation for truth, notwithstanding the lapse of three years.

2. CHARGE OF THE COURT is measurable by the evidence, and need not transcend the legitimate deductions therefrom.

3. JURY LAW — PRACTICE IN THIS COURT. — If the defendant had not exhausted his peremptory challenges when the panel was filled, it is not material on appeal that his challenges for cause were erroneously overruled by the trial court.

4. INDICTMENT. — Being found guilty of murder the defendant moved in arrest of judgment because the indictment charged one G. as well as himself with the crime, and then stated that it was not intended thereby to charge the said G., inasmuch as he was separately indicted for the same offense. *Held*, that, as the indictment was good so far as appellant was concerned, his motion in arrest was properly overruled.

5. FACT CASE. — See evidence in a murder case held sufficient to identify the body of the deceased, and note a state of proof held not to necessitate instructions to the jury on the law of manslaughter.

APPEAL from the District Court of Liberty. Tried below before the Hon. EDWIN HOBBY.

This appeal is from the conviction of Pat Lum, the appellant, for murder in the second degree, and the assessment of a term of fifteen years in the penitentiary. It was charged in the indictment that he and Ed. Green, on April 1, 1875, of their malice aforethought, did kill and murder one William Churchill by stabbing him on the back and shoulder. Following the charging allegations

was a clause, viz.: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present to said court that the said Ed. Green being presented to said court, for the same offense herein charged, in a different indictment, it is not the intention of said grand jurors to charge him herein with said offense." After the verdict was rendered the defense moved in arrest of judgment because of this clause in the indictment, and, the motion being overruled, reserved exceptions.

The case came to trial at the fall term, 1881, of the District Court of Liberty county. It is disclosed that the defendant made his escape soon after the disappearance of William Churchill, who was a stranger in that section of country. One witness thought he was an Englishman, and another spoke of him as an Irishman, and it is incidentally disclosed that he had for a short time been in the employ of Ed. Green or his father.

The testimony at the trial was elicited from a number of witnesses, mostly introduced by the prosecution for the purpose not merely of proving the homicide but of identifying a certain body found in the woods as that of William Churchill. Only the most salient portions of this testimony are quoted or summarized in the opinion of this court, and there is much more which seems necessary to elucidate the case.

Pat Byrne, the first witness for the State, and the only eye-witness of any of the incidents directly relied upon by the prosecution to inculpate the defendant, was a youth of not quite sixteen years of age in March, 1875, when, as alleged in the indictment, the homicide was committed. His father, M. Byrne, and the family then lived about six or seven miles west of the town of Liberty, and on a public road leading to the town from the neighborhood in which Ed. Green and the appellant lived. About a mile from the town the road crosses the Trinity river, where there was a ferry.

The witness stated that in the morning of March 13, 1875, the defendant, the deceased, Ed. Green and a negro boy named Aaron Whitley passed the Byrne homestead, on horseback, going towards the town of Liberty; and in the evening of the same day, while witness was in the woods looking for a horse, and about a mile from home in the direction of the town, he saw the same persons passing back. Churchill's face was then bleeding. They were talking as though they were quarreling, and this first attracted the attention of witness, who was then not more than twenty steps from them. The negro boy was in front, Ed. Green next, and the deceased and defendant in the rear. They passed out of witness's sight behind some underbrush and a turn in the road, and while thus screened from his view he crossed the road, from whence he again saw them as they got into an open place. He then saw Pat Lum, the defendant, who was about half a horse's length behind and on the left of Churchill, reach over and strike the latter in the back, and a little below the shoulder-blade, as it seemed to witness. Witness saw no knife. The quarreling had continued until the blow was struck. It does not appear that the witness saw Churchill fall from his horse, or observed the immediate effect of the blow; but he stated that he then saw Ed. Green and the defendant dragging the body off in the woods on the opposite side of the road from him and out of his sight. This occurred about an hour before sunset. The body was afterwards found by John Stiles and witness's father in the same direction he saw it dragged, and about a mile from his father's, and 115 or 120 steps from the road. Witness was not acquainted with Churchill, the deceased, and saw him for the first time that morning, as he and the others passed the house of witness's father on their way towards Liberty. Witness was in the smoke-house when they passed and saw them plainly through a crack in the house, which was

only about ten steps from the middle of the road. The body was found thirteen days after witness saw the defendant and Green dragging it off. From the place where he saw the blow he, without finding the horse, went straight home, and daylight was nearly gone when he reached there. Defendant, the negro and Green had passed the house a little while before witness got back there. Witness, when he got home, told what he had seen to no one but his mother, and she told him to tell no one else, and threatened to whip him if he even told his father. She was not in good health, and remarked that she did not want to be troubled going to court. Witness's father was not informed of what witness had seen until after defendant had made his escape, and then learned it from witness's mother and came and asked witness about it. It was not on information derived from witness that his father and Stiles looked for the body in the locality where they found it. After dark on the Wednesday next before the Friday on which the body was found, Ed. Gill and Mr. Tuller came, and the former asked witness's father if he knew anything about the man who went to town with the defendant, the negro boy and Green, and said that the man was missing and was supposed to have been killed by the others. After Gill left, witness heard his sister call his father's attention to the fact that he had spoken of the last Saturday when he should have said last Saturday a week. Witness did not see the body the day it was found. From the first view witness had of defendant and the others in the evening of March 13th, until they passed up the road towards his father's, five minutes or more elapsed; they remained a few minutes under the hill where they dragged the body, and then returned, got on their horses and rode off. Witness did not go about Rose's house that day. He was positive that the man struck by the defendant was the same man he saw in the morning riding towards Liberty with Green,

defendant, and the negro boy, and who, as he afterwards learned, was named William Churchill. Witness, at the time of the trial, was living at Beaumont, in an adjoining county, and had been away from Liberty county about three years. His father and the family had remained in the latter county but a short time after he left it.

M. Byrne, the father of the preceding witness, testifying for the State, said that he saw the defendant and the deceased with Ed. Green and the negro boy, when they passed his house in the forenoon of March 13, 1875, going towards the town of Liberty. He had previously seen the deceased when the latter had stopped at his house and inquired the way to Ben Green's, the father of Ed. Green. He thought Churchill, the deceased, was an Englishman; he seemed between twenty-seven and thirty years of age, and had black hair and blue eyes, and on the day mentioned was riding a bay horse. In the afternoon of the same day the defendant, with the negro boy and Ed. Green, returned by the house of witness, and Green was then leading the horse which the deceased was riding in the morning. Before they came by in the evening, the witness and others of his household heard fearful screams in the direction of the town of Liberty, and from a distance, he thought, of about a mile. Thirteen days afterwards he and John Stiles found Churchill's body about the place from which the shrieks came, and about a hundred paces from and north of the public road. The body was first found by Stiles. It was lying on its left side. Behind the left shoulder blade was a cut about four inches deep, and there seemed to be a knife-cut near his mouth, and the mark of a blow upon the head. The body was much swollen and very offensive, but witness saw it was the body of the same man who rode by his house in the forenoon of March 13th, along with Green, the negro boy and the defendant. One night Ed. Gill and Barney Tuller

came to witness's house and Gill told him that the man Churchill was missing and they were looking for him, and said that the defendant, and Ed. Green and the negro had apparently killed Churchill for his money. Witness told Gill that the boys (defendant and the other two) had passed his house, but did not tell Gill about the screams he heard. Some of witness's children were awake when this conversation passed between him and Gill. Witness told John Stiles and William Simpson of the screams, about March 26th. To Ben Green's from where the body was found, there was a nearer way than by witness's, but it was a very bad way. It was three or four o'clock in the afternoon when Stiles and witness found the body. They found on it no money, and nothing but a box of matches and part of a comb. It appeared to have been lying there about two weeks.

John Stiles, testifying for the State, gave a similar account of the search for and the finding of the body to that given by M. Byrne. He had never seen Churchill alive, but thought a person who knew him well could have recognized the body.

William Jackson, for the State, testified that on the day the defendant was said to have killed Churchill he met them and their companions about three hundred yards west of the ferry on the Trinity river, and last saw them at Rogers's place, which is about a mile from the ferry. They were going up the road toward M. Byrne's, and towards the place where the body was afterwards found, which was about three miles from from Rogers's. When they met, witness and they took a drink. Churchill rode by, and it appeared that he and the ferryman had had a difficulty. Something was said and Churchill gave it the "d—n lie." Pat Lum, the defendant, said "Do you give me the d—n lie, sir?" The party then took another drink. After that the others went on, and witness saw the defendant whipping Churchill with a switch. The

latter stood and took it, saying nothing and offering no resistance. At Rogers's all dismounted and got water, except Churchill; witness carried some water to him, and he then said to witness, "Mister, this is mighty bad, but I reckon it will be all right." A week from that day the witness rode up to Mr. Ben Green's, and the defendant and Ed. Green came out. Witness said to them,—"Boys, they will give you fellows hell about that fellow." They said they had not seen the man Churchill since he fell off his horse at the Black Hill, which witness understood to be about two miles from Byrne's towards Liberty. Witness had never seen Churchill since they parted at Rogers's, and thought the sun was then not more than half an hour high. Recurring to what transpired at Rogers's, the witness stated that Churchill said it was hard to bear but he would make it all right. Defendant said that Jim Peters, the ferry-man, had knocked Churchill down, and witness asked the latter if he let that fellow hit him; to which he replied that any one who said so told a G—d d—d lie. So far as the witness knew, the party were all friendly when they left Rogers's. Defendant said he was not going to bother Churchill any more, but witness did not see them make friends with each other. As friendly advice to the defendant the witness told him not to take any knife to the man. Old Scott Baldwin's was the next house, and Byrne's the second, in the direction they were going. It may be remarked that though the witness spoke of "meeting" the party, it is apparent that he and they were going in the same direction between the ferry and Rogers's.

S. De Blanc, who was sheriff of Liberty county in 1875, testifying for the State said that for a week after he heard of the homicide he was out night and day hunting for Ed. Green and the defendant, without success. He next heard of the defendant being in jail at Houston in Harris county, and, going there, received the defendant from sheriff Ashe of that county, and also a knife which Ashe

said he got with the defendant, and that it was full of blood when he got it. Witness could not himself say that there was blood on the knife, but it was rusty. He brought the defendant to Liberty, but while his examining trial was going on he escaped from one of witness's deputies. Witness understood that defendant gave himself up when last taken into custody. Witness wrapped up the knife and gave it to Esq. Lacour, the justice of the peace.

M. Byrne, recalled by the State, said that the 13th of March, 1875, was a beautiful but cold day, and that the general temperature of the weather continued cold until the body was found.

Mrs. M. Byrne was introduced by the State, and corroborated the testimony of her husband and son as to the parties who passed and returned by their house on March 13, 1875. She also heard the screams in the afternoon mentioned by her husband, but said they were about an hour before sunset, and that it was getting dark when Green, the negro boy and the defendant passed the house in the evening. When they went by in the morning her son Pat was in the smoke-house. Miss Byrne testified to the same general effect as her mother, but said she did not hear the screams.

J. M. C. Lacour, for the State, said that the knife delivered to him by De Blanc, the former sheriff, was a dirk-knife; it was rusty and looked like it had been stained with blood. He gave it to Jesse Lum, the defendant's father. Witness held the inquest over the body, between ten and eleven o'clock in the night, and at that hour he could not have recognized his own son in the condition the body was in. The body, however, was that of a white man, who, witness thought, had blue eyes and sandy hair. The wound on it was just below the shoulder blade, and there was a broken place in the face.

Pat Byrne, recalled by the State, said that Churchill

screamed when the defendant reached over and struck him. Witness was about sixty yards off when the blow was struck.

W. W. Perryman, for the State, testified that he was farming in 1875, and kept a diary in which every change in the weather was correctly noted, and by which it appeared that on the 12th of March, 1875, it rained, on the 15th it was cool, and on the 16th there was frost, and the weather did not turn warm until the 27th.

—— Jones, for the State, testified that he had seen Churchill two or three times while the latter was working at a saw mill on Cedar bayou. Prior to the report of his death he was said to be living and farming with Ed. Green. Witness had not seen Churchill since he was reported killed.

Mr. Bristley, for the State, testified that he was in the grocery business at Liberty in March, 1875, when Churchill was said to have been killed, and, on the day of that event as reported, the defendant and Ed. Green, with a man whom witness afterwards learned was Churchill, came to witness's store, and afterwards left there together. Churchill had some silver and gold in his pocket-book,—a five-dollar gold piece, witness thought, and some silver. The man Churchill paid for drinks for the party. It was late in the afternoon when they left the store of witness, and he could not say where they went.

James Ricks was the first witness introduced by the defense. He was the ferryman on the Trinity river about a mile from Liberty at the time Churchill was killed. A while after dinner on the day of that event the witness set the defendant, the deceased and Ed. Green across the river. Witness stated that the sun was not more than half an hour high when he set those men across the river on their way home. He walked with the defendant about three hundred yards to the corner of Dick Rives's

fence, and stopped there a while in conversation with defendant. While they were there Churchill rode up.

Paul Servat, for the defense, stated that the defendant, and Ed. Green, accompanied by Churchill, were at his store in Liberty the day the latter was killed, as reported. Churchill bought a can of oysters, and asked the others to eat, but they declined. Witness thought the sun was an hour and a half or perhaps two hours high, when they left his store. He thought it was in August, 1875, but acknowledged that he could not remember well.

Scott Baldwin, who said he was a hundred and seventeen years old, testified for the defense that he lived two miles west of the ferry, and saw the defendant, a negro boy, Ed. Green and an Irishman when they passed his house in the evening, "a little between dark and daylight." The others stopped at the corner of witness's fence for the Irishman to come up. Witness denied that when he testified at the examining trial he stated that the sun was an hour and a half high when the parties passed his house. Nor did he remember testifying that the defendant was beating the Irishman, or that blood was coming from the latter's face. Neither did he recollect stating that the others proposed throwing the Irishman in the river, and he, the witness, begged them not to do so. Witness acknowledged that his memory was short.

—— Rose, for the defense, stated that, on the day Churchill was said to have been killed, he, the witness, was returning from Liberty to Byrne's place, on which he then lived, and between the town and the river he met the defendant, Ed. Green, Churchill and the negro. Witness went straight home, and there found Pat Byrne, who remained there all the evening. Witness stated that he never saw the dead body nor ever stated to M. Byrne that he had looked for it.

Ed. Gill, for the defense, testified that he and ten others

engaged in a search for Churchill's body, and went to Byrne's house about midnight. Witness, accompanied by one of the others, went into the house and asked Byrne if he remembered seeing the party of men pass his house. Byrne said he did not, and then some one in the house spoke, and Byrne said that his wife said the men did pass there. Byrne said nothing to witness about hearing any screams. Witness knew Byrne's general reputation for truth, and said it was bad; but stated that Byrne had not lived in Liberty county for the past three years, and his reputation where he was then living was not known to witness. The witness said he was related to Ed. Green. He did not recollect that, after he and others were at the house of Byrne, the latter came to witness's house and told him that he, Byrne, had misunderstood the day to which witness's inquiry had reference the previous night.

Lacour, testifying for the defense, stated that the sun was about an hour high when defendant and his companions left Liberty on the day in question. They had been playing cards and drinking beer.

F. Holloman, for the defense, testified that he was one of the jury of inquest, and helped to bury the body. It was in such an awful condition that he could only see that it was the body of a white man, because the hair was straight. It did not look like a human being, and was decayed beyond witness's recognition. Possibly in daylight an acquaintance of the deceased might have recognized it. Witness probed the wound four or five inches, but was so scared that he took but little notice of the body.

John Green, for the defense, was asked if he knew the general reputation of Byrne for truth while he lived in Liberty county and at the time of the *habeas corpus* trial,— three years before the trial pending. The counsel for the State objected to the question, and the court sustained the

objection; to which the defense reserved exceptions, which are explained and discussed in the opinion of this court. With the testimony of this witness the defense closed its evidence.

In rebuttal the State called M. Byrne, who, with reference to the testimony of the defendant's witness Rose, stated that the latter told him that Pat Lum and Ed. Green had been looking for the body at night. And with regard to Ed. Gill's testimony, the witness said that he understood the inquiry made at the house by Gill to have reference to the then preceding Saturday, instead of that day of the previous week. After Gill went away, witness's mistake was corrected by his daughter; and witness afterwards went and explained the mistake to Gill.

Pat Byrne, recalled by the State, stated that he was not at Rose's house on the day in question.

Mrs. M. Byrne, recalled, testified that in the evening of March 13, 1875, her son Pat returned home a little while after the defendant, with Ed. Green and the negro boy, passed the house on their way home. Pat told witness what he saw about the killing of Churchill, and witness forbade him to tell his father or any one else about it, and told Pat she would whip him if he told it. Witness was sick at the time, and did not want to be bothered about the court; and, besides, some of the people were down on her family. After the defendant escaped she thought she would not be bothered about the matter, and then she told her husband what Pat had told her.

The testimony has been greatly condensed, and for brevity no distinction has been made between the direct and cross-examination.

*Willie & Cleveland*, and *Davis & Sayles*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WINKLER, J.   At the September term of the District Court of Liberty county, A. D. 1881, the appellant was tried and convicted of murder in the second degree, and sentenced to serve a term of fifteen years in the State penitentiary, on an indictment filed on September 23, 1880, which charges that this appellant and one Ed. Green did kill and murder one William Churchill, alleged to have been committed in Liberty on April 1, 1875.   The testimony adduced at the trial was voluminous and largely circumstantial.

The main features of the evidence may be succinctly stated as follows:   About March 13, 1875, the appellant, Ed. Green, William Churchill and a negro boy were seen passing the road leading from the neighborhood in which the parties named lived, on the west side of the Trinity river, to Liberty on the east side of the river.   Lum, Green and the deceased were seen together in Liberty, during the day, by several persons who testified in the case at the trial.   It was shown that these same parties, Lum, Green, Churchill and the negro boy, re-crossed the river later in the afternoon of the same day, and were seen by different persons along the road returning, until within a short distance of the locality where they resided, and afterwards the parties, except Churchill, the deceased, were seen pursuing their route in the same direction.

One witness testified to the following additional facts, which we quote from the statement of facts in the language of the witness: "I saw the same parties coming back from Liberty in the evening of the same day that they passed our house going towards the town of Liberty; when I saw them Mr. Churchill was bleeding on the face. I was in the woods about one mile from my father's house, in the direction of the town of Liberty, when I saw them coming back.   I saw Pat Lum, the defendant, strike at Churchill; he was behind him when he struck at him. He reached over and struck at Churchill in the back; he

seemed to have struck him a little below the shoulder-blade. I then saw them — Pat Lum and Ed. Green — dragging the body off in the woods on the right-hand side of the road as you go from the town of Liberty. The country where this was done is broken and commences declining from the road on the side where they dragged the body, and continued till you get in the bottom. They dragged the body off in the woods, from out of my sight from the side of the road where I saw the defendant strike at Churchill. The body was afterwards found in the same direction where I saw them dragging it, about one mile from my father's house, in the direction of Liberty and on the right-hand side of the road going from Liberty."

This seems to have been the last witness who saw all the parties together. This witness on cross-examination said that when he first saw the parties on their return from Liberty, "going up the road the negro was in front, Ed. Green next, Churchill and Pat Lum behind; then they passed out of sight behind some underbrush and a turn in the road; the noise of loud talking as if quarreling going on. I passed to the west side of the road while they were hid from my sight. They then got into an open place when I saw them again, and Lum then struck the blow. The noise they made first attracted my attention; they spoke as though they were quarreling."

Further along and being still on cross-examination, this witness testified that "The body was found thirteen days after I saw this; which made it on the 26th of March when the body was found. All this occurred about one mile from my father's house; after seeing this I went straight home; my father, mother and sister were there; when I returned daylight had nearly gone. After I heard the loud talking, before I saw Lum strike at William Churchill, was not long, and the quarreling continued up to the striking. Lum was on the left-hand side of

Churchill when he struck at him, about one half horse-length behind Churchill. My father and John Stiles found the body. It was about ten or twelve days after I saw the occurrence before they began to look for the body."

The next witness was the father of the first witness. This witness, after testifying to the fact of seeing the same persons pass his house going toward Liberty, stated: "On the evening of the same day, they passed back without Churchill. Before they came by, we heard some screaming in the direction of Liberty. It was in the afternoon when they passed back; I cannot place the time very well. Ed. Green was leading the horse that Churchill was riding in the morning. The horse had a saddle on him. The negro was ahead, and he waited at the creek until they — the other two, Pat Lum and Ed. Green — came up. I saw the dead body of Churchill about thirteen days afterwards, on Good Friday, the birthday of one of my daughters. Ed. Gill came one night and told me that somebody had murdered William Churchill, and the Roses told me that they had seen Pat Lum, Ed. Green and a negro boy looking about the place where the body was found, with a lantern. John Stiles and myself found the body about the same place where the shrieks came from, about one hundred paces from the public road, on the north side of the road. John Stiles first found the body; he was lying on his left side. Behind his left shoulder-blade there was a cut about four inches deep; there seemed to be a cut of a knife on his face near his mouth, and the mark of a blow on his head. The body was very much swollen, but I could see it was the same man who had passed my house that morning with the defendant, Ed. Green, and the negro boy, on their way to town."

John Stiles, who seems to have been the first person who discovered the dead body, among other things, said,

in giving his testimony with regard to the identity of the body, as follows: "Any person who knew the man well before he was killed might have identified him. He had dark hair. Mr. Byrne told me he heard some one scream down that way, and insisted on going to look for him in that direction. Mr. Byrne remained with the body, and I went for a justice of the peace. I got back about eight or nine o'clock, probably later, that night. I had never seen Churchill before that time. I saw him dead; never have seen him since. He was a stranger in this country, and had not been here long."

We quote from another witness who seems to have seen the parties on their return from Liberty in the afternoon. He says: "I met them about half-way between Rogers's place and the ferry. We all took a drink. Churchill rode by, and it appeared that there had been some difficulty between Churchill and the ferryman; something was said and Churchill gave it "the damn lie." Pat Lum, the defendant, said, "do you call me a damn lie, sir?" We took another drink. After they went ahead I saw defendant whipping Churchill with a switch. Churchill stood and took it without saying anything, and without offering any resistance. They all got down at Mr. Rogers's and got some water, except Churchill. I got him the water and he said to me, 'Mister, this is mighty bad, but I reckon it will be all right.' That was after Lum had whipped him. I saw Pat Lum and Ed. Green one week from that day. I rode up to Mr. Ben Green's, and Ed. Green and Pat Lum came out. I said to them, 'Boys, they will give you fellows hell about that fellow.' They said they had not seen the man Churchill since he fell off his horse at the Black Hill. The Black Hill, as I understood it, is about two miles from Mr. Byrne's place, towards the town of Liberty. When they left Mr. Rogers's place, they went in the direction where the body was afterwards found, up the road. I have

never seen the man Churchill since that day, that I know of." We have not attempted to set out the entire testimony of these witnesses either on their direct or cross-examination, nor to extract from any other witness's testimony, many of whom testified in the case.

The foregoing extracts will serve to indicate the general character of the case as developed upon the trial. We do not deem it important to consider in this opinion all the several grounds presented in the assignment of errors. The controlling questions presented in the brief of counsel for the appellant, seem to us to be: First, the sufficiency of the evidence to support the verdict and judgment, mainly as to the sufficiency of the testimony as to the identity of the body of the deceased. Secondly, alleged error in the ruling of the court upon the testimony offered by the defendant for the purpose of impeaching the testimony of certain of the State's witnesses; and thirdly, supposed error in the failure of the court to submit to the jury the issue of manslaughter.

I. Whilst it is true that "No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the killing" (Penal Code, art. 549), still we are of opinion that in this case, if the witnesses for the State are worthy of belief, the body found some thirteen days after the killing is the body of the missing man William Churchill, and that he is the same man charged to have been murdered. The proof of the witnesses shows, we think satisfactorily, that the body found was that of the identical person who was seen going to and returning from the town of Liberty, in company with the appellant, Ed. Green and the negro boy, and the man the appellant was seen whipping with a switch on the return from Liberty, and who was last seen alive by the witness who heard the wrangling and saw the striking at the deceased by the appellant. The place where the lick would

have struck deceased corresponded with the wound which appeared on the body when found, and the body was found in the direction of the place where screaming had been heard on the same afternoon. The three other persons who were together and with the deceased in the morning were seen returning without the deceased, and having charge of the horse he was riding in the forenoon. And still further, the body was found in the same direction one witness had seen the appellant and Ed. Green dragging the body of Churchill down the hill. The testimony of Mr. Byrne alone was sufficient to not only identify the body as being that of Churchill, but his and other testimony showed that he had come to a violent death and at the hands of the appellant, or that of the appellant and Green acting in concert.

II. It is shown by one of defendant's bills of exception that the defendant offered evidence to discredit Mr. Byrne. The State's proof (the bill recites) shows, if it shows any offense, that it was committed in March, 1875. The defendant, Pat Lum, was a short time afterwards before the examining court. The witness Byrne was a witness before the examining court, and subsequently a witness on the hearing of a *habeas corpus* sued out by Pat Lum in the same case. The witness Byrne had been living in the neighborhood where the offense was alleged to have been committed for about five years before the time at which said offense was alleged to have been committed, and was living there when he testified in the examining court and on the hearing of the *habeas corpus*, and for some time after. But the witness for the past two or three years had been living in Beaumont. The defendant asked the witnesses Ed. Gill and John Green, as follows: "Do you know the general character of the witness Mr. Byrne for truth and veracity among his neighbors at the time he lived in this county, and at the time he testified before an examining court in this case, and on the hear-

ing of a *habeas corpus* sued out by defendant in this case?" The State's counsel objected to the question and the court sustained the objection; and the defendant took a bill of exceptions to the ruling.

Abstractly considered, we are of opinion the question was a proper preliminary question to ask a witness who is offered for the purpose of impeaching a witness on the opposite side of the case. The rule cited by the counsel for the State, to the effect that, "When a witness has a fixed domicile, the impeachment of his character must relate to the time of the trial and the place of his domicile," is not applicable to or decisive of the question here presented. Generally, when a witness is offered for the purpose of impeaching another, he must show his competency to testify as to the general character of the witness sought to be impeached, among his neighbors. It is not what the opinion of the witness may be which qualifies him to testify as an impeaching witness; he must be able to testify to the general character of the witness sought to be impeached among his neighbors,— his general character, or the general reputation he has established among those among whom he has lived, or with whom he has most associated. The presiding judge, in giving his reasons for the ruling complained of, says: "The question involved in this ruling was simply this,— the witnesses were asked if they knew the reputation of Byrne for truth and veracity when he lived in this county three years ago, and when he testified some years ago before the examining court in this case. It was objected to by the State's attorney on the ground that they should only testify to the reputation of Byrne for truth and veracity in the neighborhood he now resides in, and testify to his present character for truth and veracity, and the court sustained the objection, stating that the witness could testify whether he knew Byrne's character at this time,— the time he was giving his testimony. The evi-

dence of the examining court was not introduced upon the trial. The witness Gill did state to the jury that Byrne's reputation for truth was not good when he lived in this county in 1875, but that he was not acquainted with it now, and did not know how it stood and could not testify as to what his character at this time was for truth and veracity."

In general the authorities all agree that it is a requisite of law that, in order that an impeaching witness may be competent to impeach another witness, he must know what his general character is among his neighbors for truth and veracity. This question was a proper one. The ruling of the court was prejudicial to the rights of the defendant under the law. (See in point, *Kelly* v. *State*, 61 Ala. 19, and *Sleeper* v. *Van Middlesworth*, 4 Denio, 431.) When a certain state of things is once proved to exist, the law presumes its continuance until a change is shown. *Therefore,* when a witness, called to impeach the character of another witness, offers to speak as to the general character of the witness attacked, as it existed some two or three years before the trial, it is not too remote and its rejection is error. *State* v. *Lanier,* 79 North Carolina, 622, and authorities there cited.

III. Did the court err in omitting to charge on manslaughter? From a careful examination of the testimony, we fail to discover any proof which presents an issue of that character, or shows any probable cause, to reduce a voluntary homicide from murder to manslaughter, or which would excuse, or justify the act of killing. It is the duty of a trial judge to measure his charge by the evidence adduced, and to give instructions to the jury as to every legitimate deduction to be drawn from the evidence; but when he has done this, the law's demands are satisfied. The testimony did not call for an instruction on manslaughter as that grade of culpable homicide is defined by law.

There were objections raised to the competency of two of the jurors summoned for the trial, as shown by bill of exception. It is shown that the defendant avoided these jurors by peremptory challenges, and that they did not serve as jurors on the trial. It further appears that the defendant did not exhaust his peremptory challenges. In such a case, even if there had been any erroneous ruling, it could not be cause for reversing the judgment by this court, as has been repeatedly decided.

The charge of the court is deemed to be substantially correct, under the proofs. There were no exceptions taken thereto, at the time of its delivery, nor were any additional charges asked on either side.

The indictment, notwithstanding the objection raised thereto in the overruled motion in arrest of judgment, is amply sufficient so far as this appellant is concerned, and he alone was tried under it.

After a patient consideration of the case, our conclusions are that the judgment must be reversed on the ruling on the evidence.

*Reversed and remanded.*